**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| PETER C. KESLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:06-CV-805 PPS |
| | ) | |
| ANDREW C. KESLING, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Peter Kesling trusted his son Andrew; so much so that he agreed to sell him controlling interest in the corporation he built and ran for decades.  Assuming the allegations in Peter's Complaint are true, Andrew was not the man he thought.  Andrew was stealing from the company and never told Peter about it before the sale.  According to Peter, he was duped by his son's nondisclosure and therefore he was defrauded.  This unfortunate lawsuit is the fight over the spoils.  Peter seeks to rescind the transaction and regain control of the corporation.  Despite his efforts to construct a legal theory upon which he can reverse the transaction, there is no basis in law to do so.  Andrew's Motion for Summary Judgment [DE17] is **GRANTED**.

**BACKGROUND**

The parties essentially agree about the pertinent facts, and where they don't, I recount them in the light most favorable to Peter, the nonmoving party.  TP Orthodontics, Inc. ("TPO"), manufactures and supplies products for the orthodontic industry.  (*See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. [DE27] ("Response") at 1; *see also* Def.'s Br. in Supp. of Mot. for Summ. J. [DE18] ("Brief") at 2-3.)  TPO is an Indiana corporation founded in 1955 by Peter and

his dad.  (*See* Br. at 2.)  Peter served as President from approximately 1960 until 1981, and he was Chairman of the Board of Directors from 1981 until about 2002.  (*See* Resp. at 1.) Although he resigned the chairmanship in 2002, Peter continued to serve on the Board of Directors and has remained active in the company serving as a consultant to the Research and Development Department. (Pl.'s Ans. to Def.'s 1st Set of Interrogs. to Pl. [DE18-12] ("Interrogatory Answers") at 2.)

From 1984 until 1988, Andrew served on TPO's board.  (*See* Br. at 3.)  Since 1988, Andrew also served as president of TPO; he succeeded his father as Chairman of the Board in 2002.  (*See* Resp. at 1.)  Prior to the transaction at issue here, Andrew owned less than five percent of the voting shares of the company.  (*Id.*)  Peter, by contrast, owned over fifty percent of the voting shares of TPO, and thus he had the controlling interest.

Throughout the decades they worked together, Peter developed a trust in his son Andrew. Andrew had good management skills, and by 2004 Peter believed it was in the best interests of TPO to transfer voting control of the company to Andrew.  (Resp. at 1.)  Consequently, in June 2004, Peter agreed to sell his majority ownership to Andrew.  (*Id.* at 1-2.)  Pursuant to two agreements between Peter and Andrew, Andrew acquired slightly more than fifty-one percent of the voting shares of TPO, (*see* Br. at 3-4 & 6-7), and agreed to pay Peter approximately $765,000.00, (*see* Resp. at 1-2).  Under the two agreements, the protocol for determining the price of the shares was dictated by a 1973 agreement, which was amended in 1993.  (*See* Br. at 5-6).  After the 2004 transaction, Andrew became the majority shareholder of TPO, and he remained its President and Chairman of its Board.

From 1992 until the present, Andrew has been party to several licensing agreements with

TPO.  (*See* Compl. [DE1] ¶ 5.)  Of particular importance to the present case, a 1992 licensing

agreement granted TPO a license to use technology described by the claims of U.S. Patent

Number 5,263,859, a patent on which Andrew was the named inventor.  (*Id*.)  Pursuant to the

License Agreement, Andrew assigned to TPO the exclusive right to use the invention disclosed

by the '859 Patent in exchange for five percent of the net sales generated by such use.

TPO paid Andrew royalties for several years evidently without much issue.  But in 2005

Peter came to believe that at least some of the payments under the License Agreement were

improper because the products for which the royalties were paid were not covered by the '859

Patent.  (*See* Resp. at 2.)[1]  This is when the shine evidently came off Andrew in his dad's mind.

But a year earlier, when the transaction took place, Peter was not aware that the royalty

payments were improper, and he openly admits that he did not question Andrew about the

royalties or investigate the subject in connection with the 2004 transaction.  (Resp. at 23.)  The

subject, it seems, never even came up.  Peter says this is because Andrew knowingly and

intentionally hid it from him.  (Compl. ¶ 7.)  Had he known that Andrew was receiving royalties

not due him, Peter claims that he never would have entered into the transaction and turned over

control of the company to Andrew.  (*Id*. ¶ 8.)  The allegations concerning the improper receipt of

royalties is the crux of the fraud claims.

Having discovered that TPO was making royalty payments that were not necessary under

---

[1]  This is the one few factual areas of significant disagreement between the parties.  Peter
contends that Andrew was not entitled to the many of the royalties paid to him, (*see* Compl. ¶ 6),
whereas Andrew maintains that the payments were proper, (*see* Def.'s Ans. & Affirmative
Defenses [DE6] ¶ 6).  Because Peter is the non-moving party, the Court construes all facts and
makes all reasonable inferences in the light most favorable to him.  *See Hemsworth v.
Quotesmith.com, Inc.*, 476 F.3d 487, 489 n. 1 (7th Cir. 2007).  Thus, for the purposes of this
Motion, the Court presumes the payments were not required under the License Agreement.

the License Agreement, Peter presented his concerns to TPO's Board.  (*See* Br. at 7-8.)  TPO's long-time patent counsel initially determined the payments were proper.  He later changed his mind after another lawyer was consulted and arrived at the opposite conclusion.  (*See id*.)  Peter then sent a letter to Andrew demanding Andrew return the royalty payments and threatening a shareholder derivative suit.  (*Id*. at 8-9.)  The parties agreed to submit the question to a committee appointed by the Board, which would then investigate the propriety of the payments. (*Id*. at 9-10.)  Although the independence and thoroughness of the committee's review is hotly contested, the committee ultimately concluded that the payments to Andrew were entirely proper.  (*Id*. at 18.)

Dissatisfied with the committee's conclusion, Peter filed this case in Indiana state court which was removed here on diversity grounds (Andrew is a citizen of Michigan, Peter of Indiana and the amount in controversy plainly exceeds $75,000).  Boiled to its essence, the Complaint contends that Peter was the victim of a fraud premised on the fact that his son never disclosed that he was accepting royalty payments from TPO to which he was not entitled, and that Peter would never have sold controlling interest in the company had he known this fact.  Andrew now moves for summary judgment.

## DISCUSSION

Although discovery has not yet concluded, Andrew filed the present Motion for Summary Judgment [DE17].  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).

4

One of the contested issues is the propriety of summary judgment even though discovery has not yet closed.  Andrew argues that summary judgment is premature because more discovery is needed related to the investigation and conclusions of the special committee appointed by TPO's Board.  (Resp. at 21.)  But because I conclude that the committee's determination is irrelevant, and because further discovery will not alter the legal conclusions upon which this Order is based, I see no reason to invoke Rule 56(f).

There are three causes of action at play which the parties agree are governed by Indiana law: a violation of the Indiana Securities Act, (Compl. ¶¶ 9-12); constructive fraud, (*id*. ¶¶ 13-18); and actual fraud, (*id*. ¶¶ 19-23).  Peter seeks one remedy: rescission of the 2004 transaction. (*See id*. ¶¶ 12, 18 & 23).[2]  But before diving into the merits of each of these claims, I must dispense with Andrew's claim that this lawsuit is, in essence, a derivative action subject to Indiana Code § 23-1-32-4(c).

# I.   PETER'S CLAIM THAT THIS IS A SHAREHOLDER DERIVATIVE ACTION

Under Indiana law, shareholder derivative actions "are suits asserted by a shareholder on the corporation's behalf against a third party . . . because of the corporation's failure to take some action against the third party."  *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 234 (Ind. 2001) (quotation marks and citations omitted).  These are actions brought to redress an injury sustain by a corporation.  *Id*.  Yet, even in the shareholder context, there is a fine line between

---

[2]  A fourth count of the Complaint based on breach of contract is moot because it sought specific performance regarding the delivery of stock certificates to the escrow agent.  (*See id*. ¶ 26.)  That was accomplished after the Complaint was filed, and Peter admits that it is no longer an issue in the case.  (Resp. at 3.)  In addition, Peter suggests that Andrew may have violated § 10(b) of the federal Securities Exchange Act and Rule 10b-5 promulgated thereunder.  (*See* Resp. at 13.)  Because Peter's Complaint does not raise a claim under the federal securities laws, the Court expresses no opinion regarding the validity of his argument.

actions vindicating corporate interests and those based upon a primary or personal right.  *Id*. at

235.  For example, actions seeking to "recover for loss of a corporate opportunity, to recover

corporate waste, and to recover damages to a corporation caused by an officer or director's self-

dealing" are typically derivative.  *Id*.  On the other hand, actions "to vindicate rights belonging to

the shareholders themselves," such as the "right to vote, compel dividends, prevent oppression or

fraud against minority shareholders, inspect corporate books and to compel shareholder

meetings" are considered direct, or individual, actions.  *Marcuccilli v. Ken Corp.*, 766 N.E.2d

444, 449 (Ind. Ct. App. 2002).

Derivative actions are governed by Indiana Trial Rule 23.1 and by Indiana Code § 23-1-

32-1, and they are subject to different requirements than suits vindicating individual rights.  *See*

*G & N Aircraft*, 743 N.E.2d at 234-35.  Generally, in a derivative action, a shareholder must first

ask the board of directors take action.  *In re Guidant S'holders Derivative Litig.*, 841 N.E.2d

571, 572-73 (Ind. 2006).  The board may then establish a committee to investigate the allegations

and determine whether the corporation should pursue litigation.  *See* Ind. Code § 23-1-32-4.  If

the committee determines that pursuing a derivative action is not in the corporation's best

interests, that determination is presumed to be conclusive.  *Cutshall v. Barker*, 733 N.E.2d 973,

978 (Ind. Ct. App. 2000).  However, the committee's determinations are not dispositive where

the court finds the committee either (1) was not "disinterested" or (2) did not investigate in

"good faith."  *Id*.  *See also Guidant*, 841 N.E.2d at 576.

The parties in this case go to great lengths arguing over whether Peter's claims are

derivative and whether the committee's determination is dispositive.  Andrew asserts that Peter's

claims are, in essence, an attempt to assert TPO's rights against Andrew under the License

Agreement and therefore are effectively derivative claims.  (*See* Br. at 17-18; *see also* Def.'s

Reply Br. in Supp. of Mot. for Summ. J. [DE39] ("Reply") at 2.)  But Peter is not asking that

money wrongfully paid to Andrew be returned to TPO.  He simply claims he was duped by his

son in the sale of his shares, and he wants the transaction rescinded.  This is not a derivative

action.  Indeed, it is not even one of the borderline actions in which Peter is asserting rights he

possesses because of the fact that he holds TPO stock (such as the right to vote or compel

dividends).  *See, e.g.*, *G & N Aircraft*, 743 N.E.2d at 234-35.  Since this action is not a

shareholder derivative suit, I need not decide whether TPO's committee was independent and

operating in good faith when it found that Andrew did nothing wrong.

## II.      CLAIM UNDER THE INDIANA SECURITIES ACT

Peter's "principal claim" is that Andrew violated the antifraud provision of the Indiana

Securities Act, codified under Indiana Code § 23-2-1-12.  (*See* Resp. at 3-4.)  That provision

states:

> It is unlawful for any person in connection with the offer, sale or purchase of any
> security, either directly or indirectly, (1) to employ any device, scheme or artifice
> to defraud, or (2) to make any untrue statements of a material fact or to omit to
> state a material fact necessary in order to make the statements made in the light of
> circumstances under which they are made, not misleading, or (3) to engage in any
> act, practice or course of business which operates or would operate as a fraud or
> deceit upon any person.

Ind. Code § 23-2-1-12.  Section 12(2) does not require an "intent to defraud," but rather "turns

entirely on whether the information disclosed was accurate, if disclosed at all."  *Manns v.*

*Skolnik*, 666 N.E.2d 1236, 1248-49 (Ind. Ct. App. 1996).  "If material information is either

misrepresented or omitted entirely, then the statute has been violated."  *Id*. at 1248.  Materiality

is determined under an "objective test" where "[t]here must be a substantial likelihood that the

7

disclosure of the [misstatement or the] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available."  *Id*. at 1249 n. 8 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976)).

According to Peter, he decided to transfer control of TPO to Andrew "at a time when he believed it was in the best interest of the corporation," and "[h]ad he known about the royalties Andrew was wrongfully collecting from TPO, [he] would not have concluded that providing absolute control to Andrew was good for TPO's well-being."  (Resp. at 14.)  Therefore, the argument goes, Andrew possessed material information (the fact that he was accepting royalties that were not due him under the License Agreement) that was "vitally important in deciding whether to sell that stock to Andrew."  (*Id*. at 10-11.)  Peter concludes that, because Andrew did not disclose that information, or made only a partial disclosure in the form of presenting checks for the royalties without telling Peter that he was not entitled to them, he violated § 23-2-1-12(2). (*See id*. at 10-15.)

Andrew counters that he has not violated the Indiana Securities Act.  Among other reasons, Andrew claims that any misrepresentation or omission he may have made were not made "in connection with" with the 2004 transaction.  (*See* Reply at 8-9.)[3]  There is no genuine issue of material fact with respect to Peter's Indiana Securities claim.  That claim must fail because there is no evidence that Andrew made a material misrepresentation or omission *in*

---

[3]  Although this issue was first raised in the Reply brief, Peter moved for, and was granted leave to file a sur-reply to correct certain allegedly incorrect assertions of fact and to address new issues raised in the Reply.  (*See* Pl.'s Mot. for Leave to File Surreply in Opp'n to Def.'s Mot. for Summ. J. [DE42]; *see also* Dec. 7, 2007 Order [DE43].)  Nevertheless, Peter did not address this issue.  (*See* Peter Kesling's Surreply in Opp'n to Def.'s Mot. for Summ. J. [DE44].)

*connection with* the 2004 transaction.

As noted above, the general requirement for all three of the subparts in § 12 is that the conduct occur "in connection with the offer, sale or purchase of any security."  Ind. Code § 23-2-1-12.  Peter makes only blunt assertions that Andrew's withholding of information regarding TPO's royalty payments was "in connection with" the 2004 transaction.  (*See, e.g.*, Compl. ¶ 11 ("Andrew's conduct prior to and in connection with the 2004 Transaction was in violation of Ind. Code § 23-2-1-12"); Resp. at 14 ("In connection with that transaction, Andrew had a fiduciary duty to disclose that he was receiving royalties to which he was not entitled.").)  These assertions do not explain the connection between the 2004 transaction and Andrew's acceptance of unnecessary royalties going back to the mid 1990's.  It appears that Peter's position is that the transaction simply would not have occurred had Peter not trusted Andrew to run TPO.  Therefore, the argument goes, any facts about Andrew that might affect Peter's level of trust in his son – such as his acceptance of the royalties – are "in connection with" the transaction.

This interpretation of the "in connection" requirement is a stretch.  Under the federal securities laws, the "in connection with" limitation requires the misrepresentation to pertain to the securities themselves, or the consideration offered for them.[4]  For instance, in *Gurwara v. LyphoMed, Inc.*, 937 F.2d 380 (7th Cir. 1991), the Seventh Circuit held that an employer's misrepresentation to an employee that a change in his employment status would not affect his

_____

[4]  The Supreme Court of Indiana recently noted that reference to federal authority is often appropriate in interpreting the Indiana Securities Act.  *See Lean v. Reed*, 876 N.E.2d 1104, 1108-09 (Ind. 2007).  While such reference might not be appropriate where the language of the federal and the state statutes differ, *see id.*, because both the Indiana Code § 23-2-1-12 and § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), use the "in connection with" language, the Court believes that Indiana courts would find reference to federal case law to be appropriate here.

ability to exercise stock options was not "in connection with" the purchase or sale of securities

because the misrepresentation concerned only the plaintiff's ability to purchase the securities,

not the value of the securities themselves – *i.e.*, it was a fraud relating to the employment

contract.  *Id.* at 381-83.  Here's how the court articulated the standard:

> The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Gurwara*, 937 F.2d at 382 (quoting *Chem. Bank v. Arthur Andersen & Co*, 726 F.2d 930, 943 (2d

Cir. 1984)).  Because the misrepresentation in *Gurwara* was "unrelated to the value of the

involved security or the consideration offered for it," it was not "in connection with" the

transaction.  *Id.*

 Similarly, even an investment manager's repeated misrepresentations that he would

faithfully perform his duties regarding the investments "while secretly intending to carry out a

plan to divest" the investor does not satisfy the "in connection with" requirement.  *See Pross v.

Katz*, 784 F.2d 455, 457-58 (2d Cir. 1986).  Such a misrepresentation only satisfies the

requirement if it is "part of the consideration for a sale of securities."  *Id.* at 457.  And even

where two directors are fraudulently induced to cast a vote that ultimately enabled other

directors to fire them, which triggered a forced sale of their stock to the corporation at a

discount, the fraud is not "in connection with" the securities transaction.  *See Ketchum v. Green*,

557 F.2d 1022 (3d Cir. 1977).  Rather than demonstrating a misrepresentation in connection with

a securities transaction, such actions were simply "an instance of internal corporate

mismanagement."  *Id.* at 1027 (noting that "Congress by § 10(b) did not seek to regulate

transactions which constitute no more than internal corporate mismanagement") (quoting *Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)). Even though *Ketchum* involved a but-for causation – that is, the transaction would not have occurred but for the misrepresentation – that was not sufficient. Thus, the "in connection with" limitation requires that the misrepresentation pertain to the securities transaction.

Here, Andrew's failure to disclose that he had been accepting the unnecessary royalties was not a misrepresentation or omission "in connection with" the 2004 transaction. First, the mere "but for" connection between Andrew's nondisclosure and the 2004 transaction does not amount to conduct "in connection with" that transaction. In fact, Andrew's alleged misrepresentations were completely independent of the transaction; one had nothing to do with the other. That is because the misrepresentations, assuming they occurred, were designed to induce unnecessary royalty payments, not to induce a securities transaction. They simply did not pertain to the 2004 transaction. In that sense, this case is more like *Gurwara*, where the fraud related to the employment contract, not the securities transaction, or *Ketchum*, where the misrepresentations demonstrated internal corporate conflict, not securities fraud. Assuming Andrew's conduct was fraudulent, the fraud related to the License Agreement, not the transaction involving the sale of the securities to Peter.

Second, reference to the issues raised by the alleged omission here further supports the notion that the omission was unrelated to the 2004 transaction. The issues raised by Andrew's alleged acceptance of unnecessary royalties include: (1) the limits of the '859 Patent; (2) whether the TPO products in question were covered by the '859 Patent; (3) who prepared the statements and checks related to the royalties; and (4) whether Andrew knew that the products were not

11

covered by the patent.  None of those issues have *anything* to do with the 2004 transaction.

Finally, the conclusion that the alleged omission was not "in connection with" the 2004 transaction is clinched by considering the alternative that Peter's construction requires.  Peter's contention is, essentially, that he had faith in his son and, therefore, any misrepresentation or omission related to Peter's judgment of Andrew's character is "in connection with" the 2004 transaction because it may have had an impact on whether the transaction took place.  One can think of a myriad of possible facts – both related and unrelated to TPO – that Andrew may have known, but Peter did not, that might have impacted Peter's assessment of Andrew.  Suppose Andrew had traveled on company business and then padded his expense report.  This may have colored Peter's perception of the trustworthiness of his son, but it would not be an action "in connection" with the sale of the securities anymore than the improper receipt of the royalty payments is.  To allow Peter to claim fraud on any fact that may alter his judgment would stretch the Indiana Securities Act exponentially, and place an unbearable disclosure burden on all parties.  This Court does not believe the Indiana Supreme Court would interpret the statute in such a way.  Therefore the Indiana Securities Act claim fails.

## III.   ACTUAL AND CONSTRUCTIVE FRAUD

Peter's Complaint also asserts causes of action under Indiana common law for constructive fraud, (Compl. ¶¶ 13-18), and actual fraud, (*id*. ¶¶ 19-23).  Although the claims have different elements, they both fail in this case because Andrew did not have a duty to disclose his allegedly improper acceptance of the royalties.

Under Indiana law, "[c]onstructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage,

irrespective of the actual intent to defraud." *Biberstine v. N.Y. Blower Co.*, 625 N.E.2d 1308, 1315 (Ind. Ct. App. 1993). Indiana case law contains more than one iteration of the elements of constructive fraud. *See Strong v. Jackson*, 777 N.E.2d 1141, 1146-47 (Ind. Ct. App. 2002) (reconciling two different versions of the elements); *Siegel v. Williams*, 818 N.E.2d 510, 515-16 (Ind. Ct. App. 2004). But under either version, the plaintiff must prove that there was a duty owed by the defendant to the plaintiff due to their relationship; and that there was a violation of that duty by the making of deceptive material misrepresentations or by remaining silent when a duty to speak exists. *Id*.

The duty owed to the complaining party may arise in different ways, such as "by virtue of the existence of a fiduciary relationship, or in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Strong*, 777 N.E.2d at 1146. It can also arise out of a confidential relationship between the parties. *See Hardy v. South Bend Sash & Door Co., Inc.*, 603 N.E.2d 895, 901 (Ind. Ct. App. 1993). *See also Doe v. Howe Military Sch.*, 227 F.3d 981, 991 (7th Cir. 2000). The existence of a duty is a question of law for the court to decide. *See Hardy*, 603 N.E.2d at 901.

A cause of action for actual fraud is similar to, but slightly narrower than, constructive fraud.

> The elements of actual fraud are: (i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) was relied upon by the complaining party and (v) proximately caused the complaining party injury.

*Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996). *See also Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992); *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App.

2004).  Although the elements expressly require a misrepresentation, actual fraud also exists

where there is "the failure to disclose all material facts by one on whom the law imposes a duty

to disclose."  *Fleetwood Corp. v. Mirich*, 404 N.E.2d 38, 42 (Ind. Ct. App. 1980).  *See also Grow*

*v. Ind. Retired Teachers Cmty.*, 271 N.E.2d 140, 145 (Ind. Ct. App. 1971).  Although the case

law is not entirely clear, it appears that for the purposes of actual fraud, a duty to speak can arise

in much the same way as the duty in a constructive fraud claim.  *See Fleetwood*, 404 N.E.2d at 42-

47.     Because in this case both the constructive fraud and the actual fraud claims hinge upon

the existence of a duty imposed upon Andrew to disclose the allegedly improper royalty

payments, I will address the duty component for both together.  Peter points to multiple bases

from which he says Andrew's duty arose.  The Complaint claims that "[b]y virtue of his

positions as a director and officer of [TPO], Andrew's relationship to Peter was as a fiduciary."

(Compl. ¶ 14.)  It also appears to assert that Andrew's duty arose by virtue of the fact that

"Andrew held the trust and confidence of Peter."  (*Id.* ¶ 15.)  Peter also claims that Andrew

imposed a duty upon himself by making only a partial representation to Peter about the royalty

payments.  (*See* Resp. at 9-10.)  Thus, Peter argues that there are three sources of Andrew's duty

to speak in the constructive and actual fraud context: (1) his fiduciary duty arising out of his

positions within TPO; (2) his obligations arising out of the confidential relationship he had with

Peter; and (3) his partial disclosures regarding the royalty payments.  None of these arguments is

persuasive.

> ### A.      The Fiduciary Duty

As a general rule, Indiana law holds that "shareholders in a close corporation stand in a

fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the

corporation and with their fellow shareholders." *Barth v. Barth*, 659 N.E.2d 559, 561 (Ind. 1995). *See also G & N Aircraft*, 743 N.E.2d at 240; *Marcuccilli*, 766 N.E.2d at 448. But in the context of the sale of stock to one another, "the existence of the fiduciary duty [can turn] upon whether the corporation or the director, individually, was acquiring the stock from the shareholder." *Hardy*, 603 N.E.2d at 900 (citing *Fleetwood*, 404 N.E.2d 47). *See also Riggin v. Rea Riggin & Sons, Inc.*, 738 N.E.2d 292, 307 (Ind. Ct. App. 2000) (noting that the fiduciary duty imposed upon shareholders in a close corporation "attaches to acts done in the capacity of a director, officer or shareholder"). So when a corporate director sells his personal shares or buys shares from other shareholders for his personal ownership, he "owes no fiduciary duty to disclose information he possesses regarding the value of the stock to the other shareholders." *Hardy*, 603 N.E.2d at 900. *See also Yerke v. Batman*, 376 N.E.2d 1211, 1214-15 (Ind. Ct. App. 1978).

There are two exceptions to the rule that a director buying or selling shares for his personal ownership has no duty to disclose the information he possesses. *See Hardy*, 603 N.E.2d at 900-01. The first is where the stock sale "affect[s] the general well-being of the corporation." *Id*. at 900. The second is where the director is dealing with one who has a "limited role" in the corporation and therefore has less access to the information the director possesses. *Id*. at 900-01.

Peter claims both exceptions are present here. First, Peter argues that "the general well-being of the corporation was unquestionably at stake," because the 2004 transaction "transferred absolute voting control of the corporation from one shareholder/director to another." (*See* Resp. at 14 (citing *Hardy*, 603 N.E.2d at 900; *Fleetwood*, 404 N.E.2d 38; *Yerke*, 376 N.E.2d at 1215)

15

(quotation marks omitted).)  But the cases Peter relies on for this broad proposition do not help him.  *Hardy* found there was no duty because the value of the stock in the transaction was determined "by the mutual agreement of the parties and not by the financial report" which the director had withheld from the shareholder.  603 N.E.2d at 900.  The same is true here where the value of the stock at issue in the 2004 transaction was controlled by a 1993 agreement that established a share transfer price protocol.  (*See* Br. at 5-7.)  In *Fleetwood*, the director's stock purchase was made on behalf of the corporation and therefore the court did not apply the exception.  404 N.E.2d at 46-47.  Finally, while *Yerke* suggests that transfer of majority ownership, where it was "found not to be in the best interest of the corporation," may trigger a disclosure duty, *see* 376 N.E.2d at 1215 n. 1 (citing *Perlman v. Feldman*, 219 F.2d 173 (2d Cir. 1955)), the court also noted that the duty required the disclosure of "the terms of [the] sale to other shareholders," *id*. at 1214.  Peter claims that Andrew violated a duty of disclosure *to Peter* regarding *the royalty payments*, not some duty to the other shareholders regarding the terms of the 2004 transaction.  (*See* Resp. at 14.)  Andrew did not hoard the royalty information in an attempt to acquire Peter's stock on the cheap; nor did he hide the terms of his acquisition from the other shareholders to their detriment.  Thus, the cases Peter cites do not establish the duty Peter claims Andrew violated.

The second exception – the limited director exception involving parties with unequal access to information – also does not apply.  It is true that Andrew was managing the affairs of TPO as its president and was the inventor the '859 Patent and, as such, was likely familiar with the coverage of the patent.  But Peter was certainly not in the dark on the affairs of TPO.  After all, he was the founder of TPO and served as its President and the Chairman of its Board for

16

decades. (*See* Resp. at 1.) At the time of the 2004 transaction, he was the majority shareholder, (*see id.*) and was on the Board of Directors, and even after the 2004 transaction was still involved in TPO's research and development, (*see* Interrog. Ans. at 2). Indeed, given his ownership of a majority of the voting shares, Peter was in many ways a superior to Andrew. It is unfathomable that he and his son had unequal access to information about TPO. Peter implicitly admits as much. After all, he was the one who discovered in 2005 that the royalties were improper, (*see* Resp. at 2), and he openly admits that he did not investigate the royalty payments to Andrew prior to the 2004 transaction, (*see id.* at 23). Therefore, Peter cannot avail himself of the "limited role director" exception in order to establish that Andrew had a duty to disclose issues related to his acceptance of royalties.

In this regard, this case is strikingly similar to *Hardy*. *See* 603 N.E.2d at 900-01. In *Hardy*, the complaining party ran the company years before the suit and gradually narrowed his involvement in the firm. *Id.* He "remained familiar with the operation" of the company; was present when dividends were declared; received the company's tax forms; and had access to the company's financial information. *Id.* As a result, the court concluded that he "was not a director unfamiliar" with the company. *Id.* at 901. Peter's role in TPO is very similar.

In sum, because the fiduciary duties often associated with being a shareholder or director in a closely-held corporation do not generally apply to personal transactions, *see Fleetwood*, 404 N.E.2d at 46, and because neither of the exceptions to that rule apply here, Peter has failed to establish that Andrew had a fiduciary duty to disclose the allegedly improper royalty payments to Peter as part of the 2004 transaction.

**B.      The Confidential Relationship Duty**

17

Under Indiana law, "a confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Strong*, 777 N.E.2d at 1148 (quotation marks and brackets omitted).  In addition, "the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge" and "it must be shown that the dominant party wrongfully abused this confidence by improperly influencing the weaker so as to obtain an unconscionable advantage." *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind. Ct. App. 1983).  Typically, confidential relationships exist "where there is a blood, marital or fiduciary relationship," but they can also arise "because of personal friendship and when one party knows that the other is relying upon him in such a manner." *Grow*, 271 N.E.2d at 143.  The existence of such a relationship is generally a question of fact.  *See Dawson v. Hummer*, 649 N.E.2d 653, 661 (Ind. Ct. App. 1995).

Peter claims that a confidential relationship existed between he and Andrew with respect to the 2004 transaction.  Throughout Peter's pleadings, he alludes to the fact that he trusted his son.  (*See, e.g.*, Compl. ¶ 15 ("At the time of the [2004 Transaction], Andrew held the trust and confidence of Peter. . . ."); Resp. at 1 (". . . and because Andrew was his son, Peter developed a trust in Andrew and his apparent management skills").)  Peter's argument appears to be that because there was a blood relationship between he and Andrew, and because he in fact trusted Andrew, Indiana law recognizes a confidential relationship between them and imposes upon Andrew the duty to disclose the allegedly improper royalty payments.

Peter misses the fact that he stood on essentially equal footing with Andrew; and therefore Indiana law does not impose a duty upon Andrew arising out of a "confidential

relationship."  As noted above, to establish a duty arising out of a confidential relationship in Indiana, Peter must show that he was "in a position of inequality, dependence, weakness, or lack of knowledge."  *Peoples Trust*, 443 N.E.2d at 879.  While this is ordinarily a question for a jury, no reasonable juror could find that to be the case on these facts.  As discussed above, Peter stood on roughly equal footing with Andrew, and he was arguably in a stronger position given his majority ownership, and his standing as a founding member of the company.  This is bolstered by the fact that Peter claims to have himself discovered that the royalties were improper.  (*See* Resp. at 2.)  Peter made a decision that was part business and part personal; but he had access to all of the information he needed, even the information he claims was owed to him.  He simply did not use it.  But there is no evidence that Andrew preyed on Peter and coaxed him into not investigating the royalty payments.  Because Peter stood on roughly equal footing with Andrew, he cannot seek protection from an alleged confidential relationship with him.  And that relationship cannot support a duty to speak for the purposes of Peter's fraud claims.

### C.        Partial Misrepresentation

Even where it ordinarily does not impose a duty to speak, Indiana law creates such a duty if it is necessary to correct a partial misrepresentation.  *See Thompson v. Best*, 478 N.E.2d 79, 84 (Ind. Ct. App. 1985).  *Thompson* is the paradigm.  There, a home seller told a buyer about the home's sump pump and drainage tiles, as well as isolated water incidents, but did not explain that there was a consistent water problem.  *Id*. at 81.  When the buyer moved in, he soon discovered the chronic water issues.  *Id*.  In holding that the buyer had provided sufficient evidence to send the case to a jury, the court noted that the seller did not even need to have actually misrepresented the water issues to the buyer, because "[a]s soon as [the seller]

19

introduced [the buyer] to the fact of the sump pump and the drainage tiles around the house, it

was incumbent upon [the seller] to *fully* declare any and all problems associated with their

function." *Id*. at 84 (emphasis in original).  In other words, one can't tell half the story, create a

false impression, and then later claim that they made a "full disclosure." *Id*.

Peter claims that Andrew made only a partial representation to Peter regarding the

royalty payments, and therefore was obliged to divulge the whole truth.  (*See* Resp. at 10.)  Peter

asserts that the partial representation concealed the whole truth from him.  (*See id*.)  Peter's

argument is as follows:

> the [royalty] checks presented to Peter for signature identified the products of
> TPO for which royalties were paid and provided net sales of those products. . . .
> However, the information provided by Andrew was not complete.  These
> representations were not accompanied by disclosure of the fact that the products
> identified as the basis for royalties were not covered by the claims of Andrew's
> '859 Patent.

(Resp. at 10 (citations omitted).)

The partial misrepresentation rule does not apply here because Peter has failed to show

how any partial misrepresentation is related to the stock sale.  The *Thompson* case is different

because there the seller made a statement that did not disclose the full truth and was actually

related to the transaction at hand.  (Reply at 9-10.)  This case is more akin to *First Bank of

Whiting v. Schuyler*, 692 N.E.2d 1370, 1373-74 (Ind. Ct. App. 1998), where the court found no

fraud because the seller made full disclosure regarding the issue about which he was questioned,

even though he did not disclose related – but still distinct – problems about which he was never

asked.  (*See id*. at 10.)

The point of the partial misrepresentation rule, as it is described in *Thompson*, is to

protect an unknowing party from deceptive representations regarding the transaction at hand.

Suppose the seller in *Thompson* stated that his car was running fine when in fact its brakes were shot and it was leaking oil, but made no misleading statements about his house. This would not entitle the home buyer to allege a fraud in the transaction for the house – even if the statement about the car was in direct response to one of the buyer's questions. That is because the partial misrepresentation would have nothing to do with the house transaction. So it is here where the alleged partial misrepresentations – the presentations of the royalty checks for signature – had nothing to do with the 2004 transaction. In other words, Peter is pointing to an entirely separate set of disclosures related to an entirely different transaction in order to claim fraud on the 2004 transaction. While it is possible that the presentation of the royalty checks to Peter had some impact on Peter's subjective assessment of Andrew and thereby made him more likely to agree to the 2004 transaction, such a connection is far too attenuated from the 2004 transaction to say that he can base a fraud claim on those representations. It would be like saying the hypothetical *Thompson* buyer could bring his fraud claim against the seller because he was persuaded to purchase the house because he trusted the seller's statements about the car. This Court does not believe that the Indiana courts would make such a stretch.

In sum, there is simply no basis to find that Andrew had a duty to disclose anything about the allegedly improper royalty payments as part of the 2004 transaction. Consequently, there is no genuine issue of material fact with respect to Peter's constructive and actual fraud counts. Those counts must fail as a matter of law.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [DE17] is hereby

**GRANTED**, and Count IV of the Complaint is **DISMISSED WITHOUT PREJUDICE**.

Because all claims asserted in this matter have now been resolved, the Clerk of the Court is

hereby **ORDERED** to **TERMINATE** this case.

**SO ORDERED**.

ENTERED: March 26, 2008

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT